IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

7-ELEVEN, INC.,

    Plaintiff,

v.

MMN CORPORATION and
MOHAMED MANSOUR NASRA,

    Defendants.

Case No.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, 7-Eleven, Inc. ("**7-Eleven**"), sues Defendants, MMN Corporation ("**MMN**") and Mohamed Mansour Nasra ("**Mr. Nasra**"), and alleges:

### Parties

1. 7-Eleven is a corporation organized and existing under the laws of the state of Texas with its principal place of business in Irving, Texas.

2. Mr. Nasra is an individual residing in and a citizen of Massachusetts.

3. MMN is a corporation organized and existing under the laws of Massachusetts with its principal place of business in Revere, Massachusetts.

### Jurisdiction and Venue

4. Subject matter jurisdiction in this matter is founded upon 15 U.S.C. § 1121 and 28 §§ 1331 and 1338. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

5. The Court also has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants operate the business that is the subject of this action in Suffolk County, Massachusetts. Additionally, a substantial part of the events giving rise to this action occurred in Suffolk County, Massachusetts.

**The 7-Eleven® Franchise System**

7. 7-Eleven is an operator and franchisor of convenience store retailing businesses and is the premiere brand in that industry.

8. 7-Eleven created the convenience store industry. It was the first store to operate on a 24-hour schedule, the first to offer self-service fountain drinks, take out coffee, and many other innovations.

9. 7-Eleven evolved from an ice company in the 1920s that began selling milk, eggs, and bread from an improvised storefront. The company's stores were originally known as "Tote'm Stores" but in 1946 the name of the stores was changed to "7-Eleven" to reflect the hours of operation—7 a.m. to 11 p.m.—and has been in continuous use since.

10. Today, there are more than 60,000 7-Eleven® stores throughout the world, with some 10,000 of those located in North America. In substantial part, this growth has been the result of 7-Eleven's immense popularity—so much so that it has a ubiquitous presence in American culture with 7-Eleven® stores and parodies of them featured in countless films and songs, such as Back to the Future, The Simpson's Movie, and the song The Magnificent Seven by the Clash.

11. 7-Eleven has developed methods and procedures—called a "system"—used in the operation of convenience store businesses. 7-Eleven's system is a comprehensive business format for the establishment, operation, and development of high-standard convenience food store

businesses with distinctive features in products, services, distribution, accounting, training, and management assistance.

12. The 7-Eleven system is designed to ensure that 7-Eleven® convenience stores and the services and products offered by them meet uniform, high quality standards. 7-Eleven's system is also designed to protect 7-Eleven's name and reputation. The 7-Eleven system is founded upon adherence to 7-Eleven's standards and specifications.

13. 7-Eleven's system is the culmination of decades of 7-Eleven's experience and investment of resources into its development and refinements. Over many years, 7-Eleven has expended untold resources and efforts in advertising and other efforts to gain customer association of 7-Eleven and its stores with speed, convenience, and quality.

14. To identify the source, origin, and sponsorship of 7-Eleven® convenience stores and the services they offer—and to distinguish those 7-Eleven® convenience stores and their products and services from those established, made, offered and sold by others—7-Eleven has extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, including but not limited to the following names and marks (the "**7-Eleven Marks**"):

| Mark | Registration Number | Effective Date |
|---|---|---|
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

15. The 7-Eleven Marks are registered on the Principal Register of the United States Patent and Trademark Office. The registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

16. 7-Eleven has given notice to the public of the registration of the 7-Eleven Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the 7-Eleven Marks.

17. 7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven convenience stores and the services they offer throughout the United States, including the Commonwealth of Massachusetts, since the date of their registration.

18. 7-Eleven and its authorized franchisees use the 7-Eleven Marks as the marks and trade identity by which the products and services offered by 7-Eleven and its franchisees are distinguished from other convenience store businesses and the products and services offered by them.

19. 7-Eleven and its authorized franchisees have extensively advertised and promoted 7-Eleven convenience stores and the services they offer under the 7-Eleven Marks throughout the United States and through various media.

20. As a result of such efforts and the considerable resources devoted to those efforts, the services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including the Commonwealth of Massachusetts.

21. In addition, the majority of 7-Eleven stores have prototypical architecture of rectangular-shaped single-story stores having brick fronts with distinctive fascia, door, and

window treatments. Likewise, the interior of 7-Eleven® stores often feature white walls with green and red horizontal striping near the ceilings. These are important features of 7-Eleven's trade dress and components of its image.

22.     The 7-Eleven Marks and trade dress are often part of the building structure and inseparable from its realty. The marks are also often incorporated into functional components and products of the equipment used in 7-Eleven® stores, such as fountain backsplashes and its point-of-sale register terminals, which print receipts displaying the 7-Eleven® Marks.

### 7-Eleven® Franchising

23.     7-Eleven has been franchising since the 1960s and approximately 80% of its United States stores are franchised. Through written franchise agreements, 7-Eleven licenses the use of its marks and its system of operating convenience stores to others, requiring them to operate uniformly and in accordance with 7-Eleven's specifications in order to protect 7-Eleven's image and brand.

24.     In exchange, a 7-Eleven® franchisee must pay to 7-Eleven a defined percentage of its gross profit (net sales less cost of goods sold), called the "**7-Eleven Charge**."

25.     7-Eleven uses financial information provided by its franchisee to calculate the store's gross profit, and in turn, impose the 7-Eleven Charge. More specifically, franchisees must report financial data to 7-Eleven through both an In-Store Processor ("**ISP**", also sometimes called the "**back office computer**") and through Point of Sale ("**POS**") cash registers.

26.     Other salient features of the 7-Eleven® franchise system include:

    A.     The Open Account: 7-Eleven extends financing to its franchisees for use in the operation of franchised stores. The amount financed by 7-Eleven and the balance due from its franchisee is maintained in an account defined in the franchise agreement as the "Open Account." Essentially, the Open Account is a running working capital account that carries the outstanding balance that 7-Eleven has loaned to the franchisee. In exchange for the financing provided by 7-Eleven, the franchisee grants a security interest to 7-Eleven in,

among other things, the store's inventory and proceeds.

     B.    <u>Retail Information Systems</u>: 7-Eleven® franchisees must use a proprietary Retail Information System computer system and software having various point-of-sale, inventory management, and back-office functions. Through this Retail Information System, software, and via the POS registers and ISP, a franchisee reports virtually all store transactions to 7-Eleven, including sales, inventory acquisitions and adjustments, payroll, etc.

     C.    <u>Inventory Reporting & Accounting</u>: A franchisee can finance its purchase of store inventory through the Open Account or purchase inventory with cash. In either instance, the franchisee is obligated to report the inventory transaction and submit the related invoice to 7-Eleven. This inventory is accounted for under 7-Eleven's system using a retail accounting system, meaning that inventory in a store is valued at the retail selling price determined by the franchisee. For financial reporting purposes, the inventory value is converted to a cost value using the Variable Inventory Percentage ("**VIP**"), which is the average ratio of cost to retail selling price for all merchandise in a store.

     D.    <u>Cash Reports</u>: 7-Eleven® franchisees must prepare and transmit to 7-Eleven a daily cash report ("**Cash Report**"). Among other things, the Cash Report sets forth the daily sales and whether those sales were for cash or credit. The Cash Report also accounts for deductions from cash receipts that affect the daily deposit, such as a franchisee's cash payment to a vendor to acquire merchandise for sale in the store.

     E.    <u>Daily Deposit</u>: The cash receipts of the franchise business must be deposited daily into a bank account controlled by 7-Eleven. The Cash Report is a crucial component of balancing the store's transactions and ensuring the bank deposit amount equals the total cash receipts and other cash transactions conducted by the store.

     F.    <u>Minimum Net Worth</u>: Most 7-Eleven® franchised stores must maintain a "Minimum Net Worth" of $15,000. A franchisee's "Net Worth" is essentially the sum total of its assets minus its liabilities. The Minimum Net Worth requirement is intended to protect 7-Eleven's investment in the store, its exposure for the Open Account, and to assure that 7-Eleven® franchisees are financially vested in the operation of their stores.

     G.    <u>Monthly Financials</u>: 7-Eleven prepares monthly financial statements (called "**Financial Summaries**") for each store from its bookkeeping records. This information in its bookkeeping records is supplied primarily by the franchisee through the Cash Reports prepared by the franchisee and submitted through the ISP to 7-Eleven. The Financial Summaries are provided to the franchisee usually by the tenth day of the following month and include, among other things, an income statement, balance sheet, and calculation of the Open Account balance and Net Worth.

**The Franchise Agreement with Defendants**

27. On March 28, 2016, MMN entered a franchise agreement, ancillary agreements, and addenda (collectively, the "**Franchise Agreement**") for 7-Eleven® Store No. 37401A, located at 191-193 Shirley Avenue, Revere, Massachusetts 02151 (the "**Store**"). A copy of the Franchise Agreement is attached as **Exhibit** "**A**".

28. Mr. Nasra, as the sole owner of MMN, executed a Principals' Guaranty Agreement (the "**Guaranty**"), guaranteeing the payment and performance of MMN's obligations under the Franchise Agreement. A copy of the Guaranty is appended to the Franchise Agreement.

29. Prior to franchising the Store, 7-Eleven had selected its location, leased the property, and made physical improvements to the premises. 7-Eleven also outfitted the Store with equipment for the operation of a convenience store, such as coolers, soda fountains, grills, a safe, cash registers, and so on (the "**Equipment**").

30. The Store's premises and Equipment are (sub)leased to MMN through the Franchise Agreement.

31. The lease provisions of the Franchise Agreement contain exclusive use clauses. The purpose of these clauses is to ensure that only a 7-Eleven® business is operated on premises where 7-Eleven has made these investments, that is, on real property it owns or has acquired via a long-term lease from a third party so that locational goodwill is retained and 7-Eleven property is used only for its intended purpose—to operate and use as a 7-Eleven® store.

32. 7-Eleven also provided financing to MMN, including financing for the Store's inventory. Store inventory and other assets are subject to security interests in 7-Eleven's favor, which secure all indebtedness of MMN to 7-Eleven.

**Defendants' Merchandising and Store Image Defaults**

33. The Franchise Agreement requires MMN to carry, use, and offer for sale inventory of the type, quality, and variety that 7-Eleven specifies in the Franchise Agreement, 7-Eleven's operations manual, and merchandising guides.

34. Despite these obligations, in February 2018, 7-Eleven began to observe a concerning decline of Store image standards and out-of-stock conditions at the Store, issuing at that time to MMN an informal Letter of Notification that the Store did not meet the 7-Eleven image and merchandising standards. Specifically, 7-Eleven observed unacceptable out-of-stock conditions in fresh condiments, beverages, cereal, assorted snacks, grocery items, pet food, among other categories.

35. The Store's image and foodservice problems persisted and on May 16, 2018, 7-Eleven issued to MMN a Notice of Material Breach based on Defendants' failure to operate the Store consistent with the 7-Eleven image and failure to comply with merchandising standards.

36. The Store's image and foodservice problems recurred in July 2018, and 7-Eleven then issued to MMN another Notice of Material Breach (dated July 13, 2018) for failure to operate the Store consistent with the 7-Eleven image and comply with foodservice standards.

37. True copies of the May 16, 2018 and July 13, 2018 Notices of Material Breach are attached as **Composite Exhibit "B."**

**Defendants' Financial Default**

38. The Franchise Agreement requires MMN to maintain the Store at a Minimum Net Worth of $15,000.00. Without the Minimum Net Worth obligation, a 7-Eleven® franchisee can draw to itself all the receipts of the business and continue operations by using the credit offered by 7-Eleven through the Open Account.

39. On October 1, 2018, 7-Eleven issued a Notice of Material Breach to MMN because the Store's Financial Summaries as of August 31, 2018, reflected the Store's Net Worth registered at $4,765.00, which is below the $15,000.00 threshold required under the Franchise Agreement (the "**Net Worth breach notice**").  The Net Worth breach notice is attached as **Exhibit "C."**

40. The Net Worth breach notice gave MMN three business days to cure the net worth defaults.

41. MMN failed to cure its Minimum Net Worth violation within the permitted time.

### Defendants' Audit Refusal

42. The Franchise Agreements allows 7-Eleven to conduct an audit of, among other things, the Store's receipts, cash register funds, cash, and bank drafts, if the Store's Net Worth falls below the Minimum Net Worth required by the Franchise Agreement.

43. Given MMN's uncured Net Worth shortage, on October 5, 2018, 7-Eleven representatives requested access to the Store and its cash control devices (including the safe) so that the representatives could undertake a cash audit.

44. MMN refused to allow 7-Eleven's representatives access to the safe and prevented them from undertaking the cash audit.  7-Eleven therefore issued an additional Notice of Material Breach dated October 5, 2018 to MMN (the "**Access breach notice**"). The Access breach notice is attached as **Exhibit "D."**

45. Per the Franchise Agreement, the Access breach notice allowed three business days for MMN to cure by permitting 7-Eleven access to the Store's safe and its cash control devices so that it could undertake a cash audit.

46. Defendants has failed and refused to give 7-Eleven access to the safe and other cash control devices within the permitted time.

**Termination of the Franchise Agreement**

47. The Franchise Agreement terminated, by its terms and per the MMN's failure to cure the Net Worth breach notice and Access breach notice within the permitted cure periods.

48. Defendants have also failed and refused to make deposits and complete daily Cash Reports for the Store since October 1, 2018.

49. On November 5, 2018, 7-Eleven met with Defendants to confirm the termination of the Franchise Agreement due to the uncured Net Worth and Access breaches and delivered to Defendants on that day a written Notice of Termination. At this meeting and in the Notice of Termination, 7-Eleven demanded that Defendants surrender possession of the Store and pay the $102,935.92 balance of the Store's Open Account.

50. A true copy of the November 5, 2018 Notice of Termination is attached as **Exhibit "E."**

51. Per the November 5, 2018 Notice of Termination, 7-Eleven also terminated the Franchise Agreement because MMN had received more than three Notices of Material Breach in the previous twenty-four-month period, which per the Franchise Agreement, permits 7-Eleven to immediately terminate the Franchise Agreement without opportunity to cure.

52. In the Notice of Termination and in the Access breach and Net Worth Breach that preceded it, 7-Eleven declared Defendants' Store lease and the Equipment lease terminated and demanded that Defendants comply with their post-termination obligations under the Franchise Agreement, including that they immediately quit the premises and deliver possession of the Store and its inventory and Equipment to it.

**Defendants' Violation of Post-Termination Covenants and Infringement**

53. Notwithstanding the Franchise Agreement's termination and 7-Eleven's demands for possession of the Store's premises and Equipment, Defendants continue to operate the Store and are falsely holding it out to the consuming public as an authorized and duly licensed 7-Eleven® store.

54. To protect itself, 7-Eleven has advised its vendors that the store operated by Defendants is no longer a 7-Eleven® convenience store, despite its appearance otherwise, and that Defendants are not authorized to carry or purchase 7-Eleven's proprietary brands.

55. The Store's condition and operations has already and will continue to deteriorate as time progresses because Defendants cannot comply with 7-Eleven's system.

56. There is no reasonable way for a customer to know that Defendants' store is not authorized to use 7-Eleven's marks and not associated with the 7-Eleven® system. By all appearances, the Store remains, and its premises appear to be, a 7-Eleven® store, although it is not.

57. It is impractical if not impossible for Defendants to sufficiently separate the distinguishing characteristics of the Store from 7-Eleven. Consequently, unless Defendants are prohibited from continuing their operations, 7-Eleven's brand and image are at risk and will be impaired by a customer's negative views and association of experiences at the Store's location with the 7-Eleven® brand.

58. 7-Eleven is also prevented from making productive use of its own property as a consequence of Defendants' conduct. In particular, Defendants have no right of continued possession of the premises or Equipment following termination of the Franchise Agreement.

59. All conditions precedent to bringing this suit have occurred, have been satisfied, or have been waived.

## COUNT I -- EVICTION

60. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

61. The Franchise Agreement was terminated effective not later than November 5, 2018.

62. Upon termination of the Franchise Agreement, Defendants were obligated to surrender the Store's premises, equipment, and inventory to 7-Eleven.

63. By failing to relinquish possession of the Store, Defendants have committed unlawful detainer, and 7-Eleven is entitled to an order directing Defendants to surrender possession of the Store to 7-Eleven.

64. As a result of Defendants' actions, 7-Eleven has suffered and will continue to suffer irreparable injury, including, but not limited to, the inability to exploit, use, and enjoy its real property.

65. 7-Eleven will be irreparably injured if Defendants are permitted to retain possession of the Store and 7-Eleven has no adequate remedy at law for that injury.

## COUNT II - RECOVERY OF CHATTELS SUBJECT TO SECURITY INTEREST

66. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

67. 7-Eleven holds perfected security interests in the inventory and proceeds of the Store.

68. The security agreement for the Store provides that, upon termination of the Franchise Agreement, Defendants must surrender the Store's inventory and equipment to 7-Eleven.

69. Defendants have unjustly retained all inventory and proceeds of the Store, and continue to possess and make sure of its equipment.

70. As a direct result of Defendants' actions as set forth above, 7-Eleven's security interest has been harmed.

71. 7-Eleven will be irreparably injured if Defendants are permitted to retain possession of the inventory, equipment, proceeds and other property subject to its security interests, and it has no adequate remedy at law for such injury.

72. 7-Eleven prays that this Court issue an order giving 7-Eleven the right to take possession of the secured property and dispose of it as necessary to preserve its value, including the inventory, merchandise, equipment, all vending supplies (including but not limited to cups, containers and bags), receipts, the cash register fund, pre-paid operating expenses, money order blanks, bank drafts, and store supplies.

## COUNT III -- BREACH OF FRANCHISE AGREEMENT (DAMAGES)

73. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

74. In the Franchise Agreement, MMN promised to:

   A. Maintain at all times during the Term of the Franchise Agreement a Minimum Net Worth of at least $15,000;

   B. Carry at the Store all Categories of Inventory specified by 7-Eleven;

   C. Comply with 7-Eleven's Foodservice Standards and all applicable laws, regulations, and codes;

   D. Maintain a high ethical standard in the conduct of the franchised business

        and in the operation of the Store;

E.    Devote its best efforts to the business of the Store and maximization of the Store's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image; and

F.    Pay its open account balance upon the discontinuance of 7-Eleven's financing.

75.    MMN breached each of the above obligations, causing 7-Eleven to suffer damages.

## COUNT IV -- BREACH OF CONTRACT – POST-TERMINATION OBLIGATIONS

76.    7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

77.    7-Eleven terminated the Franchise Agreement because of MMN's uncured material breaches.

78.    Upon termination of the Franchise Agreement, MMN was obligated, among other things, to:

    a.    surrender the Store's premises to 7-Eleven;

    b.    surrender all 7-Eleven equipment;

    c.    immediately cease using the 7-Eleven Marks and all elements of the 7-Eleven System;

    d.    transfer to 7-Eleven the Receipts, Cash Register Fund, prepaid Operating Expenses, money order blanks, bank drafts, lottery tickets and store supplies to 7-Eleven; and

    e.    return all Trade Secrets and Confidential Information to 7-Eleven.

79.    MMN has failed and refused to comply with its post-termination obligations, materially breaching the Franchise Agreements.

80.    As a direct and proximate result MMN's breaches of its post-termination obligations, 7-Eleven has been irreparably injured, including injury to its goodwill and reputation,

as well as being deprived of its ability to utilize its property, resulting in lost revenues and profits and diminished goodwill, in an amount to be determined at trial.

## COUNT V -- BREACH OF GUARANTY

81. 7-Eleven realleges paragraphs 1 through 59, 74 through 75, and 77 through 80 above.

82. Mr. Nasra executed a Principals' Guaranty Agreement in favor of 7-Eleven.

83. Under the Guaranty, Mr. Nasra unconditionally and absolutely guaranteed the prompt and full payment of liabilities of MMN under the Franchise Agreement and the performance of all obligations by MMN under the Franchise Agreement.

84. MMN breached the Franchise Agreement, and Mr. Nasra breached his guaranty by failing to honor its terms, including by his failure to pay the amounts owing to 7-Eleven and ensure the performance of MMN's post-termination responsibilities.

85. 7-Eleven has been damaged by Mr. Nasra's breach of the Guaranty.

## COUNT VI -- LANHAM ACT - TRADEMARK INFRINGEMENT

86. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

87. Defendants' acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of goods and services under the 7-Eleven Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

88. As a direct and proximate result of Defendants' infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

89. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

90. Unless enjoined by the Court, Defendants will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VII -- LANHAM ACT – TRADEMARK DILUTION

91. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

92. Defendants' acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of non-conforming goods under the 7- Eleven Marks causes dilution of the distinctive quality of the 7-Eleven marks, in violation of 15 U.S.C. § 1125(c).

93. As a direct and proximate result of Defendants' infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

94. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation, and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

95. Unless enjoined by the Court, Defendants will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VIII -- LANHAM ACT - UNFAIR COMPETITION

96. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

97. Defendants' acts, practices and conduct constitute unfair competition, false designation of origin and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

98. As a direct and proximate result of Defendants' unfair competition, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

99. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

100. Unless enjoined by the Court, Defendants will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT IX - G.L. c. 93A

101. 7-Eleven repeats and realleges paragraphs 1 through 59 of its Complaint as if fully set forth herein.

102. At all relevant times, the parties have been engaged in trade and commerce within the meaning of G.L. c. 93A.

103. Defendants have engaged in unfair and deceptive acts and practices within the meaning of G.L. c. 93A §§ 2, 11. These actions occurred primarily and substantially within the Commonwealth of Massachusetts.

104. As a result of Defendants' unfair and deceptive acts and practices, 7-Eleven has suffered monetary damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, 7-Eleven respectfully prays for the following relief against Defendants:

(A) A preliminary and permanent injunction directing that Defendants surrender possession and be ejected from the premises and facilities at 191-193 Shirley Avenue, Revere, Massachusetts 02151;

(B) A preliminary and permanent injunction directing Defendants to surrender possession of the inventory and proceeds of the Stores at 191-193 Shirley Avenue, Revere, Massachusetts 02151, which is subject to 7-Eleven's security interests;

(C) A preliminary and permanent injunction enjoining Defendants, their agents, servants and employees and those people in active concert or participation with them, from:

    1. Using the 7-Eleven Marks or any trademark, service mark, logo or trade name that is confusingly similar to the 7-Eleven Marks;

   2. Otherwise infringing the 7-Eleven Marks or using any similar designation, alone or in combination with any other components;

   3. Passing off any of their products or services as those of 7-Eleven or 7-Eleven's authorized franchisees;

   4. Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of his businesses, products or services;

   5. Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with 7-Eleven and its franchisees or any of 7-Eleven's products or services; and

   6. Unfairly competing with 7-Eleven or its franchisees, in any manner;

(D) An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, receptacles, logo items, and advertisements, bearing the 7-Eleven Marks, in the possession of Defendants, their agents, servants and employees, and those people in active concert or participation with them, be delivered to 7-Eleven at Defendants' cost;

(E) That Defendants be ordered to account for and pay over to 7-Eleven all gains, profits and advantages derived by them as a result of their infringement of the 7-Eleven Marks and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

(G) That judgment be entered in favor of 7-Eleven and against Defendants for such damages as 7-Eleven has sustained by reason of Defendants' trademark infringement and unfair competition; and that, because of the willful nature of said infringement, the Court enter judgment for 7-Eleven for three times the amount of said damages, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117, and G.L. c. 93A §§ 2, 11;

(H) That an order be entered directing Defendants to surrender to 7-Eleven all signs, marketing materials or other materials containing any of the 7-Eleven Marks;

(I) That Defendants be required to file with the Court and to serve upon 7-Eleven's counsel within ten (10) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order;

(J) That judgment be entered in favor of 7-Eleven and against Defendants for such damages as 7-Eleven has sustained by reason of Defendants' breaches of the Franchise Agreement and Guaranty;

(K) That judgment be entered in favor of 7-Eleven and against Defendants for the costs and expenses, including reasonable attorneys' fees, incurred by 7-Eleven in connection with this action as provided for by contract or statute; and

(L)     Such other relief this Court deems just and proper.

Dated: November 6, 2018

**7-ELEVEN, INC.**

By its attorneys,

*/s/ Jennifer C. Brown*
Matthew Iverson (BBO No. 653880)
Jennifer C. Brown (BBO No. 681442)
matthew.iverson@dlapiper.com
Jennifer.brown@dlapiper.com
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
(617) 406-6000

*Of Counsel*

Christian C. Burden (motion for admission pro hac vice forthcoming)
Chris.burden@quarles.com
QUARLES & BRADY LLP
101 E. Kennedy Blvd., Suite 3400
Tampa, Florida 33602
(813) 387-0300

QB\51521853.1